IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

DANYANITA WALKER,                        *

       Plaintiff,                      *

vs.                                      *

                                  CASE NO. 3:04-CV-91 (CDL)

GOLDEN PANTRY FOOD STORES, INC., *

       Defendant.                      *

_____          *

O R D E R

Defendant's Motion for Summary Judgment (Doc. 23) is presently before the Court.[1]  For the following reasons, Defendant's motion is granted in part and denied in part.  Specifically, Defendant's motion is denied as to Plaintiff's federal discriminatory termination claim and is granted as to each of Plaintiff's remaining claims.

BACKGROUND

The facts viewed in a light most favorable to the Plaintiff are as follows:

In January 2004, Plaintiff, Danyanita Walker, was hired by Defendant, Golden Pantry Food Stores, Inc. ("Golden Pantry"), a gas station and convenience store, to be a second shift clerk.  (Def.'s Statement of Undisputed Material Facts ¶¶ 1, 3.)  The second shift generally ran from 2:00 or 3:00 P.M. to 11:00 P.M.  (Bonds Dep. 82-83.)  At the time Plaintiff began working for Defendant, she attended Athens Technical School, Elberton Campus, where she had classes from 8:00 A.M. until noon at least every other day.  (Pl.'s Dep. I 8, 9,

_____

[1]Defendant's Motion to Strike (Doc. 37) is also presently before the Court.  Consideration of the materials that Defendant seeks to strike does not affect the Court's ruling on Defendant's summary judgment motion.  Therefore, Defendant's Motion to Strike (Doc. 37)is denied as moot.

24).  Plaintiff lived in Lexington, Georgia, and therefore had to commute to work and school.  On the days that she worked and had class, Plaintiff drove from Lexington, to Elberton, to Athens, and then back to Lexington.  She estimates that her commute took approximately two hours.  (Pl.'s Dep. I 73.)

After Plaintiff was hired by Defendant, she attended an orientation session led by Richard Lowery, a Golden Pantry manager. (Lowery Dep. 15.)  During this orientation, Plaintiff learned that her duties included mopping the floor, sweeping the inside of the store and the parking lot, keeping the store clean, stocking the concession stand, keeping the bathroom clean, stocking the cooler, and taking out the garbage.  (*Id.* at 49-51.)  Upon learning that some of her duties involved physical labor, Plaintiff claims that she informed Mr. Lowery at the orientation that she "had just found out that [she] was pregnant and some of the duties that were required may be something [she] can't do when [she] get[s] on up in the stages of the pregnancy."[2]  (Pl.'s Dep. I 51.)  Mr. Lowery allegedly responded that there "would be a partner with you just about at all times."  (*Id.* at 51.)

Plaintiff's orientation also included an explanation of Golden Pantry's anti-discrimination/no harassment policy, which was contained in the employee handbook distributed to Plaintiff at the orientation. (Pl.'s Dep. I 66.)  Plaintiff admits that she read the anti-discrimination policy in the handbook.  (*Id.* at 82.)  She understood

---

[2]By "on up in the stages of pregnancy," Plaintiff meant four to five months into the pregnancy. (*Id.* at 54.)  At the time of the orientation, she was eight weeks pregnant and had not yet seen a doctor regarding her pregnancy.  (*Id.* at 52-53)

it to require an employee who believed she was being harassed or discriminated against to "talk to the manager and if nothing was done from the manager to call the corporate office . . . ." *(Id.* at 66.) Plaintiff alleges that at orientation she specifically asked Mr. Lowery if Defendant discriminated because of pregnancy, and he told her no. (Pl.'s Dep. I 81.)

After her orientation, Plaintiff was trained by Mr. Lowery at a Golden Pantry store in Athens, Georgia.  This training lasted a few days.  Plaintiff was then transferred to her permanent position at the Golden Pantry store on Lexington Road in Athens, Georgia.  Her supervisor was Ms. Theresa Patman.  Plaintiff was regularly scheduled to work the second shift with another clerk, Karen Bonds.  Although Ms. Patman was Plaintiff's supervisor, Ms. Patman's regular shift at the store was first shift.  Therefore, Plaintiff and Ms. Patman only had direct interaction during the time that their shifts overlapped. According to Plaintiff, Ms. Patman would sometimes stay just a few minutes into the second shift, and on other occasions, she would stay an "hour or hour and a half." (Pl.'s Dep. I 77.)

Plaintiff claims that shortly after she began working with Ms. Patman, Ms. Patman began treating her unfavorably.  Plaintiff alleges that this unfavorable treatment occurred after Ms. Patman learned she was pregnant.  Plaintiff maintains that this unfavorable treatment amounted to pregnancy discrimination.  Specifically, Plaintiff contends that Ms. Patman's anti-pregnancy bias created a hostile work environment and that Plaintiff was ultimately subjected to adverse employment actions, including termination, because of her pregnancy.

3

Plaintiff's allegations are somewhat vague.  They form a hodge-podge of complaints against Ms. Patman with the consistent theme that Ms. Patman mistreated her because of her pregnancy.  Although Plaintiff clearly alleges that she was mistreated due to her pregnancy, her allegations in support of that conclusion are less clear.  She is uncertain as to the sequence of events, cannot recall whether any specific incidents recurred, and acknowledges that she never informed Defendant's district manager, who visited the store once or twice a week, of the incidents prior to the termination of her employment.  Notwithstanding the vagueness of Plaintiff's factual allegations, the Court will attempt to extract from the record the alleged facts surrounding the separate incidents in an effort to evaluate Plaintiff's claims properly.

**A.  First Incident**

Plaintiff alleges that a few days after starting work at the Lexington Road Store, another employee told her manager, Ms. Patman, that Plaintiff was pregnant.  (Pl.'s Dep. I 79.)  Ms. Patman then allegedly confronted Plaintiff stating that Plaintiff knew at the time of the interview that she was pregnant, and that if Ms. Patman had known Plaintiff was pregnant she would not have hired her.  (Pl.'s Dep. I 80-81.)  After that initial confrontation, Plaintiff's interaction with Ms. Patman, according to Plaintiff, was strained. Plaintiff describes her subsequent relationship with Ms. Patman as follows:

> After that just about every day that she would be there it was always words to me that — I mean, we would be probably holding a conversation if I can remember and she would just say that always if I'd known you was pregnant I would've never hired you because pregnant people are sorry.  They can't do this, they can't do that, just little — a lot of nit — nitpicking really.

4

(*Id.* at 83.) Plaintiff, however, did not report this incident because "[a]t the time [she] feel it wasn't that bad of an incident to report." (Pl.'s Dep. I 82.)

## B.  Second Incident

Ms. Patman was told by an employee on the third shift that the Plaintiff had not stocked the cooler. (Pl.'s Dep. I 86.) Plaintiff admits that at the time she was not stocking the cooler. (*Id.*) Ms. Patman told Plaintiff that she could write Plaintiff up for failing to stock the cooler. However, instead of writing her up, Ms. Patman demonstrated to Plaintiff how the cooler needed to be inventoried and stocked. (*Id.*) Plaintiff responded that she did not think she should have to lift more than one six pack at a time because of her pregnancy. (*Id.* at 86, 88.) As explained by Plaintiff,

> Q: Okay.  What was the problem?
> A: To me with me being pregnant, I know it's a maximum amount of lifting that you – or heavy stuff that you should lift that goes anywhere between elbow height.
> Q: Who told you that?
> A: Doctor – well, the doctor did.
> Q: When did the doctor tell you that?
> A: Sometime during my pregnancy . . . when I told him I worked at Golden Pantry.
> Q: Okay.  When is the first time you went to the doctor while you worked at Golden Pantry?
> A: I really can't remember the date.

(Pl.'s Dep. I 89.) Notwithstanding Plaintiff's subjective belief that she should not have to lift certain items because of her pregnancy, she never presented anyone associated with Defendant with a doctor's statement restricting her work activities in any way. (*Id.* at 89-90.) The Court is somewhat confused as to how this incident relating to the beer is relevant to any of Plaintiff's claims given the fact that Plaintiff was never disciplined or "written up" for

failing to stock the beer, even though it was clearly one of her job duties.  In fact, Ms. Patman accommodated Plaintiff by telling her to get "whoever was on shift [to] help [her] out . . . ."  (Pl.'s Dep. I 187.)  Plaintiff nevertheless points to this incident as evidence that Ms. Patman had an animus against Plaintiff because of her pregnancy.  (Pl.'s Dep. I 92.)

## C.  Third Incident

Another incident relied upon by Plaintiff in support of her claims relates to Ms. Patman's response to Plaintiff's nausea on one occasion.  While having a conversation with Ms. Patman and Ms. Bonds, Plaintiff began to feel nauseated.  Plaintiff asked Ms. Bonds to watch Plaintiff's register while Plaintiff went to the restroom.  When Plaintiff returned, Ms. Patman asked Plaintiff what Plaintiff would do if she were to become sick when she was in the store alone.  Plaintiff told Ms. Patman in a "joking statement" that Plaintiff would "throw up in the floor."  (Pl.'s Dep. I 105.)  Ms. Patman told Plaintiff that she could fire Plaintiff for a statement like that because "you [Plaintiff] don't joke around with me [Ms. Patman] and that."  (*Id.*)  According to Plaintiff, Ms. Patman then reiterated what Plaintiff claims was a common refrain that if she (Ms. Patman) had known Plaintiff was pregnant, she would not have hired her.  (*Id.*)

## D.  Fourth Incident

On another occasion, Ms. Patman allegedly told Plaintiff that she needed to get bigger clothes because the ones that Plaintiff had did not fit.  (Pl.'s Dep. I 159-60.)  Plaintiff contends that this remark is additional evidence that shows bias against her pregnancy.  (Pl.'s Dep. I at 160.)

6

## E.  Other Discrimination

Plaintiff claims that, in general, a comment was made about her pregnancy every day.[3]  (Pl.'s Dep. 95.)  Additionally, Plaintiff claims that at some time during her month employment with Golden Pantry, Ms. Patman told Plaintiff that Plaintiff might as well quit because Plaintiff was getting her "second or third write-up." (Pl.'s Dep. I 113.)  Plaintiff understood this to mean that if she got three write-ups she would be terminated automatically.  (Pl.'s Dep. I 153.)

## F.  Write-ups

Plaintiff received three write-ups prior to walking out of the store on January 28, 2004.  (Pl.'s Statement of Disputed Material Facts Ex. D.)  On January 12, Plaintiff received her first write-up for a cash shortage and for not completing her duties from the day before.  (*Id.*)  Plaintiff does not feel that this write-up was the result of discrimination.  (Pl.'s Dep. I 146.)  Plaintiff received her second write-up on January 26 for a cash shortage that occurred on January 24.  (Pl.'s Statement of Disputed Material Facts Ex. D.)  Although Plaintiff disputes the amount of the cash shortage, Plaintiff

---

[3]Ms. Patman admits that she mentioned Plaintiff's pregnancy:
Q: After you found out about her [Plaintiff's] pregnancy from Al, did you ever make any mention about her pregnancy to Ms. Walker?
A: Yes.
Q: What did you say?
A: About the shift duties and the red book [the book employees must sign to indicate that duties have been completed,] and hours.  Just because she pregnant, don't mean she don't supposed to work, even though she was pregnant.  I told her I didn't know she was pregnant.  But you still have to do shift duties because there's no doctor note with no limitation that she could no do that she presented to me to where she couldn't do the job duties.
Q: My question was whether you said anything to her.
A: That's just -- what I just said, I said to her.
(Patman Dep. 74.)

does not believe that this write-up was the result of discrimination. (Pl.'s Dep. I 148.)    Plaintiff received her third write-up on January 26 for failing to do the cigarette count on January 25. (Pl.'s Statement of Disputed Material Facts Ex. D.)  Again, Plaintiff does not believe that this write-up was given to her because she was pregnant.  (Pl.'s Dep. I 150.)

## G.  Final Incident Resulting in Plaintiff's "Termination"

Plaintiff discovered on January 27 that her wallet was missing. (Pl.'s Dep. I 109-10.)  The next day she called Ms. Patman before her shift to tell Ms. Patman that her wallet had been stolen.  (*Id.* at 109.)  Ms. Patman "stated that no one could've gotten it because it was behind the counter and no one could come back there but the employees." (*Id.*)  While on the phone, Ms. Patman also told Plaintiff that Plaintiff had been written up for failing to stock the concession stand.  (Pl.'s Dep. I 109-10.)

When Plaintiff arrived at work later that afternoon, Ms. Patman was still at the store.  (*Id.* at 112.)  Ms. Patman told Plaintiff to come and sign the write-up for not stocking the concession stand. Plaintiff told Ms. Patman that she had stocked the concession stand, but Ms. Patman did not believe Plaintiff.  (*Id.*)  At this point, Plaintiff and Ms. Patman got into a disagreement over whether the concession stand had been stocked.  (*Id.* at 112-13; Bonds Dep. 174.) Plaintiff refused to sign the write-up and stated that she might as well quit because that was her third write-up.[4]  (Pl.'s Dep. I at 113.)  Ms. Patman told Plaintiff that she should just leave the store if she was not going to sign the write-up.  (*Id.* at 115.)

---

[4]Actually, this was Plaintiff's fourth write-up.

Plaintiff, however, refused to leave.  Ms. Patman threatened to call the police because Plaintiff was "ranting and raving."  Instead, she called her supervisor, Tammy McKnight, to explain the incident. (Pl.'s Dep. I at 115.)  Ms. McKnight did not answer the phone, and Ms. Patman left her a message.  (Pl.'s Dep. I at 116.)  Plaintiff then left the store and called Ms. McKnight.  When Ms. McKnight called Plaintiff back later that evening, she asked Plaintiff what had happened at the store.  (*Id.* at 120-21.)  Plaintiff explained that "when [she] said [she] might as well quit [she] was really asking [Ms. Patman], I might as well quit?".  (*Id.* at 120.)  Plaintiff then asked Ms. McKnight if she could have a transfer to another Golden Pantry Store.  Ms. McKnight told Plaintiff that she would have to talk to human resources and then call her back.  (*Id.* at 121.)

Janice Stern from human resources then called Plaintiff. Plaintiff explained to Ms. Stern that she "felt that [Ms. Patman] was discriminating [her] from day one that [Ms. Patman] found out [Plaintiff] was pregnant."  (Pl.'s Dep. I 122.)  Plaintiff asked Ms. Stern if she could transfer to another store, and Ms. Stern told Plaintiff that she could transfer to another store if Plaintiff found one that was hiring.  (Pl.'s Dep. I 124.)

After Plaintiff talked to Ms. Stern, she claims she saw a "Help Wanted" sign in the window of the Golden Pantry in Lexington, Georgia. Plaintiff then claims that she talked to the manager of the Lexington store who told Plaintiff that they needed help and to come in for an interview.  When Plaintiff arrived for the interview, Ms. McKnight was at the Lexington store.  Plaintiff alleges that Ms. McKnight took the Lexington store manager back into a room, and then Ms. McKnight came out and told Plaintiff that the Lexington store could not hire her

because of her "family problems."  Plaintiff speculates that this was a reference to her pregnancy.

Ms. McKnight then offered Plaintiff a job near Plaintiff's school at the Elberton, Georgia Golden Pantry.  Plaintiff claims that Golden Pantry did this because it knew Plaintiff would not be able to take the job.  Plaintiff argues that the reason she could not take this job is because that schedule would require her to drive from home, to school, back home, then back to Elberton for work, then finally back home.  Ms. McKnight claims she told Plaintiff to show up at the Elberton store for work a few days later and that they had not discussed hours for Plaintiff's shift yet.  Plaintiff acknowledges failing to show up for work on her first day at the Elberton store, but she claims she never definitely agreed to work there.  After Plaintiff failed to appear at the Elberton store, Golden Pantry considered Plaintiff to have voluntarily quit and designated Plaintiff as "Not for Rehire."  Plaintiff claims that Defendant's conduct constitutes an express termination of her employment or at a minimum a constructive discharge.

DISCUSSION

## I.  Summary Judgment Standard

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party has the burden of showing that there is no genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  This burden can

10

be met by showing that the non-moving party will be unable to "establish the existence of an element essential to [the non-moving party's] case, and on which [the non-moving party] will bear the burden of proof at trial. *Id.* at 322.

Once the moving party has met its burden, the burden shifts to the non-moving party to show that there *is* a genuine issue of material fact. *Id.* at 324. A fact is material if it "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There is a genuine issue if the evidence would allow a reasonable jury to find for the non-moving party. *Id.* In other words, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

In determining if the parties have met their respective burdens, the court may draw inferences from undisputed facts. The court resolves "all reasonable doubts about the facts in favor of the non-movant, and draws all justifiable inferences in his favor." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). "If reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment." *Augusta Iron & Steel Works v. Employers Ins. of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988).

## II.  Title VII Claims

Plaintiff claims that she was discriminated against by her employer because she was pregnant. She alleges that this discrimination is actionable under Title VII of the Civil Rights Act of 1964. It is undisputed that the prohibition against sex-based employment discrimination in section 703(a) of Title VII, 42 U.S.C.

11

§ 2000e-2(a), extends to discrimination on the basis of pregnancy. 42 U.S.C. § 2000e(k). In fact, "[t]he analysis required for a pregnancy discrimination claim is the same type of analysis used in other Title VII sex discrimination suits." *Armindo v. Padlocker, Inc.*, 209 F.3d 1319, 1320 (11th Cir. 2000)(citing *Armstrong v. Flowers Hosp., Inc.*, 33 F.3d 1308, 1312-13 (11th Cir. 1994)).

Although Plaintiff's description of her claims is not a model of clarity, a fair reading of Plaintiff's Complaint and her summary judgment briefs reveals that she is asserting two types of pregnancy discrimination claims. First, she claims that she was harassed because of her pregnancy and that this harassment was so severe that it created a hostile work environment. Second, she alleges that she received disparate treatment because of her pregnancy and that this disparate treatment resulted in adverse employment actions against her, including the termination of her employment. She asserts these federal claims under Title VII and the Pregnancy Discrimination Act (PDA). 42 U.S.C. §2000e(k).

## A. Hostile Work Environment Claim

In order to establish a prima facie case of a hostile work environment under the PDA, Plaintiff must show that (1) she belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment complained of was based on her pregnancy; (4) "the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable." *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999). It is undisputed that Plaintiff, a pregnant female, belongs to a protected group. Furthermore, construing the evidence in favor of Plaintiff as

12

required at this stage of the proceedings, the Court finds that genuine issues of material fact exist as to whether Plaintiff was subjected to unwelcome harassment that was based upon her pregnancy. However, for the reasons that follow, the Court finds that no reasonable jury could conclude that the alleged harassment complained of by Plaintiff was sufficiently severe or pervasive to alter the terms and conditions of her employment.  Therefore, Defendant is entitled to summary judgment on Plaintiff's hostile work environment claim.

To prevail on her hostile work environment claim, Plaintiff must establish that she "subjectively perceive[d] the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable." *Mendoza*, 195 F.3d at 1246; *see also Harris v. Forklift Sys, Inc.*, 510 U.S. 17, 21-22 (1993).  "[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Id.* (internal quotation and citation omitted).  In determining whether the "harassment objectively altered an employee's terms or conditions of employment," the court looks at "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Id.*; *see Harris*, 510 U.S. at 23.  Pretermitting whether Plaintiff subjectively perceived the harassment to be so severe or pervasive as to alter the terms and

conditions of her employment, it is clear that the harassment was not objectively severe under the precedent of this circuit.[5]

Plaintiff endured the alleged harassment for approximately one month.  It included the following:  (1) Ms. Patman's statements that pregnant people are "sorry" and "lazy"; (2) Ms. Patman's statement that she would not have hired Plaintiff had Ms. Patman known Plaintiff was pregnant; (3) Ms. Patman's statement to Plaintiff about her uniform not fitting properly; (4) Ms. Patman's questioning Plaintiff as to what Plaintiff would do if Plaintiff were to become sick; (5) Ms. Patman's statement that Plaintiff "wouldn't be here long"; (6) telling Plaintiff that three write-ups would result in termination; (7) "nit-picking" Plaintiff's performance; and (8) giving Plaintiff multiple write-ups in "quick succession."  (Pl.'s Mem. in Resp. to Def.'s Mot. for Summ. J. 6.)

The Eleventh Circuit has created a relatively high bar for plaintiffs asserting hostile work environment claims.  Although these claims typically appear fact intensive, the court has established a baseline for policing hostile environment claims; not every obnoxious and insensitive act by an employer will give rise to a hostile environment claim.  Boorish behavior alone does not create a cause of

---

[5]A strong argument exists that Plaintiff did not subjectively believe that the harassment by Ms. Patman was so severe or pervasive as to alter the terms or conditions of her employment.  Plaintiff described Ms. Patman's harassment as "nitpicking." (Pl.'s Dep. I 83.)  Plaintiff admitted that there were instances of harassment that she did not report because she did not feel that they were bad enough to report.  (*Id.* at 82.)  Plaintiff also admitted that she never reported any of the harassment despite knowing that Golden Pantry had an anti-harassment policy and procedure because, among other things, she did not want to get Ms. Patman in trouble.  (*Id.* at 97.)  Plaintiff's own descriptions of the events and her reactions to them do not support the claim that she subjectively perceived the harassment to be so severe or pervasive as to alter the terms and conditions of her employment.

action.   The conduct must be sufficiently severe and pervasive to alter the terms and conditions of Plaintiff's employment.   *See Mendoza*, 195 F. 3d at 1247.   Under the precedent of the Eleventh Circuit, the Court finds that the harassment complained of by Plaintiff falls well short of either severe or pervasive harassment sufficient to alter the terms and conditions of Plaintiff's employment.   Therefore, Defendant is entitled to summary judgment on Plaintiff's hostile work environment claim.

### B.   Disparate Treatment Claim

In addition to her hostile work environment claim, Plaintiff alleges that Defendant subjected her to disparate treatment based upon her pregnancy.   This claim is separate from her hostile work environment claim.  For Plaintiff to prevail on a disparate treatment claim, she must establish that she was subjected to disparate treatment because of her pregnancy and that this disparate treatment resulted in an adverse employment action.  *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004) (citation omitted).  It is unclear exactly what actions by Defendant Plaintiff contends constitute adverse employment actions resulting from disparate treatment.  Insofar as Plaintiff contends that the incidents that form the basis of her hostile work environment claim likewise constitute adverse employment actions for purposes of her disparate treatment claim, the Court rejects such claims.  For the same reasons that such conduct was not sufficiently severe or pervasive to alter the terms and conditions of Plaintiff's employment to support a hostile work environment claim, the conduct likewise does not rise to the level of an adverse employment action.  *See Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir.)(claim is not actionable under Title

VII unless employee was subjected to an adverse employment action that effected a "serious and material change" in the terms and conditions or privileges of her employment).

Plaintiff also alleges that she was terminated or constructively discharged because of her pregnancy. It is clear that Plaintiff was not constructively discharged. *See Pennsylvania State Police v. Suders*, 124 S. Ct. 2342, 2354 (2004). However, the Court finds that genuine issues of material fact exist as to whether Defendant terminated Plaintiff's employment. Moreover, the termination of Plaintiff's employment obviously constitutes an adverse employment action for Title VII purposes. To prevail on a disparate treatment termination claim, Plaintiff must establish that her termination was the result of the Defendant's alleged pregnancy discrimination. Therefore, the Court must determine whether sufficient evidence exists from which a reasonable jury could conclude that Defendant fired Plaintiff because she was pregnant.

Generally, the analytical framework used for deciding this issue depends upon whether Plaintiff's evidence of discrimination is direct evidence or circumstantial. If Plaintiff relies entirely upon circumstantial evidence, then her claim is traditionally evaluated under the structured *McDonnell Douglas* framework. If the evidence of discrimination is deemed direct evidence, then it is unnecessary to use the *McDonnell Douglas* analysis. Defendant contends that Plaintiff's evidence is solely circumstantial, and therefore, the Court must evaluate her claims under *McDonnel Douglas.* Defendant further argues that under that analysis, Plaintiff's claims fail. Plaintiff responds that she has direct evidence of discrimination, and therefore, the rigid *McDonnell Douglas* analysis does not apply.

16

### 1.  Direct Evidence

The Eleventh Circuit narrowly defines direct evidence of discrimination as "evidence, that, if believed, proves the existence of a fact in issue without inference or presumption." *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1266 (11th Cir. 1999)(internal quotation and citation omitted).  Evidence is direct evidence of discrimination only if it is "composed of [] the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of some impermissible factor." *Id.* (internal quotation and citation omitted). "If an alleged statement at best merely suggests a discriminatory motive, then it is by definition only circumstantial evidence." *Id.*

Evidence that is open to more than one interpretation is also not direct evidence of discrimination. *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 (11th Cir. 1998). Additionally, the Eleventh Circuit has required that in order for evidence to qualify as direct evidence of discrimination, the evidence must be related to the decision making process. *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).

Plaintiff claims that Ms. Patman's alleged statements that she would not have hired Plaintiff if she had known Plaintiff was pregnant, "in conjunction with" Ms. Patman's "derogatory comments about Plaintiff's pregnancy, Ms. Patman's statement that Plaintiff would not be there long, and Plaintiff's write-ups constitute direct evidence." (Pl.'s Mem. in Resp. to Def.'s Mot. for Summ. J. 4.)

Defendant responds that although Ms. Patman's statements may indicate a discriminatory motive, there is no connection between any of these statements and the decision making process.  Even assuming that Plaintiff was fired, none of these statements was made

17

surrounding or leading to a decision to fire Plaintiff. Plaintiff has not even shown that the statements were made in connection to a decision to give Plaintiff a write-up. Evidence that indicates discriminatory motive without connection to a decision by the employer does not constitute direct evidence of discrimination. *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004) ("This [c]ourt defines direct evidence of discrimination as evidence which reflects a discriminatory or retaliatory attitude *correlating to* the discrimination or retaliation complained of by the employee.") (emphasis added) (quotation marks and citation omitted); *Schoenfeld*, 168 F.3d at 1266.

Additionally, the statement that Plaintiff focuses on as direct evidence of discrimination—that Ms. Patman would not have hired Plaintiff if Ms. Patman had known Plaintiff was pregnant—is open to more than one interpretation. Plaintiff explained that Ms. Patman made this statement after their conversation about what Plaintiff would do if she were left in the store alone and began to feel sick. Ms. Patman could have been further explaining her concerns about having someone prone to illness working alone in a convenience store.

The Court is persuaded that the evidence relied upon by Plaintiff does not fit the traditionally narrow definition of "direct evidence" applied by the Eleventh Circuit in employment discrimination cases. Therefore, Plaintiff's disparate treatment claim arising from her termination must be evaluated under *McDonnel Douglas*.

### 2. Circumstantial Evidence

"When a plaintiff attempts to prove intentional discrimination in violation of Title VII using circumstantial evidence, [the Eleventh Circuit] appl[ies] the now familiar shifting burden framework

established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)*."  Schoenfeld v. Babbitt*, 168 F.3d 1257, 1267 (11th Cir. 1999)(internal citation omitted).  Under *McDonnell Douglas*,

> the plaintiff has the initial burden of establishing a prima facie case of discrimination.  If he meets that burden, then an inference arises that the challenged action was motivated by a discriminatory intent.  The burden then shifts to the employer to 'articulate' a legitimate, non-discriminatory reason for its action.  If the employer successfully articulates such a reason, then the burden shifts back to the plaintiff to show that the proffered reason is really pretext for unlawful discrimination.

*Id.* (internal quotations and citations omitted).

To establish a prima facie case of discriminatory termination of employment, the plaintiff must show that (1) she is a member of a protected group; (2) she was qualified for the position she held at the time of her termination; (3) she was terminated by her employer; and (4) she was replaced by someone outside of her protected group.[6] *See Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1185 (11th Cir. 1984).  It is undisputed that Plaintiff was a member of a protected group.  Moreover, genuine issues of material fact exist as to whether she was terminated by Defendant and whether she was qualified for the position she held at the time of her termination.[7]  The only remaining issue to be decided regarding Plaintiff's ability to make out a prima

---

[6]Discriminatory discharge may also be established by a showing that the plaintiff "is a member of a protected class, that he was qualified for the job from which he was fired, and that the misconduct for which (he) was discharged was nearly identical to that engaged in by (an employee) outside the protected class whom (the employer) retained." *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1185 (11th Cir. 1984).

[7]Defendant contends that it never terminated Plaintiff.  Plaintiff argues that a reasonable jury reviewing Defendant's conduct could conclude otherwise.  Construing all reasonable inferences in Plaintiff's favor, the Court finds that a jury question exists on this issue.

19

facie case is whether she was replaced by someone outside of her protected class, i.e., someone who was not pregnant.

The record is silent as to whether the person replacing Plaintiff was pregnant. Therefore, if the Defendant moved for summary judgment on the basis that Plaintiff could not make out a prima facie case of discriminatory discharge because she could not satisfy this element of her prima facie case, Plaintiff arguably has failed to carry her burden of overcoming Defendant's Motion for Summary Judgment. The Court finds, however, that it is unclear that Defendant moved for summary judgment on this basis. Consequently, the Court finds that Defendant has not carried its burden of establishing the absence of a genuine issue of material fact on this question—whether Plaintiff was replaced by a non-pregnant employee. Accordingly, the Court finds that Defendant is not entitled to summary judgment on the basis that Plaintiff has failed to make out a prima facie case of discriminatory termination. This does not end the inquiry, however.

The next step in the *McDonnel Douglas* analysis is to determine whether the Defendant has articulated a non-discriminatory reason for its termination. In this case, Defendant finds itself in an awkward position because it denies that it even terminated Plaintiff. Nevertheless, it appears that Defendant takes the position that if its actions are deemed to constitute a termination, its reason for terminating Plaintiff was her failure to sign the work rule violation and subsequent belligerent behavior toward her supervisor. This explanation represents a non-discriminatory reason for Defendant's action, and therefore, the burden shifts back to Plaintiff to establish that genuine issues of material fact exist as to whether Defendant's reason is pretextual.

Plaintiff has produced evidence that her supervisor repeatedly told her that if she had known she was pregnant she would have never hired her; her supervisor constantly berated her for being pregnant, indicating that pregnant people like her were lazy and sorry; and she regularly criticized her job performance and related the poor performance to her pregnancy. Moreover, an inconsistency does exist as to whether Defendant actually terminated her or not. Construing all of the evidence in favor of Plaintiff as required at this stage of the proceedings, the Court finds that genuine issues of material fact exist as to whether Defendant's stated reason for the termination was pretextual. Since genuine issues of material fact exist as to whether Defendant terminated Plaintiff's employment based upon her pregnancy, Defendant's Motion for Summary Judgment is denied as to Plaintiff's disparate treatment termination claim.[8]

## III.  STATE LAW CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Plaintiff also asserts a state law claim under Georgia law for the intentional infliction of emotional distress. Under Georgia law "[a] claim for intentional infliction of emotional distress has four elements: (1) the conduct was intentional or reckless; (2) the conduct was extreme and outrageous; (3) the conduct caused emotional distress and (4) the emotional distress was severe." *Amstadter v. Liberty Healthcare Corp.*, 233 Ga. App. 240, 242-43, 503 S.E.2d 877, 880 (1998). "The issue of whether the allegations rise to the requisite

---

[8]*See also Wright v. Southland Corp.*, 187 F.3d 1287, 1300-03. In *Wright*, the Eleventh Circuit explained that there may be situations where the plaintiff's evidence may not meet the definition of direct evidence or fit neatly into the requirements of *McDonnell Douglas*, but the evidence, in whatever form it may take, is such that a reasonable jury could conclude that plaintiff was unlawfully discriminated against.

level of outrageousness is a question of law for the trial court." *Biven Software, Inc. v. Newman*, 222 Ga. App. 112, 114, 473 S.E.2d 527, 529 (1996).

Ms. Patman's conduct toward Plaintiff was not sufficiently extreme and outrageous to give rise to a claim under Georgia law. "[T]he defendant's actions must have been so terrifying as naturally to humiliate, embarrass or frighten the plaintiff." *Id.* The conduct of the employer must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Newman*, 222 Ga. App. at 113-14, 473 S.E.2d at 529. Furthermore, "[c]omments made within the context of one's employment may be horrifying or traumatizing, but are generally considered a common vicissitude of ordinary life." *Id.* at 113, 529 (internal quotation marks and citation omitted).

Ms. Patman's statements to Plaintiff that pregnant people are sorry and lazy, that Plaintiff could be fired for three write-ups, that Plaintiff might as well quit, that Plaintiff's uniform did not fit properly, and that she would not have hired Plaintiff if she had known Plaintiff was pregnant do not rise to requisite level of extreme and outrageous conduct. These statements are at most "mere insults and indignities" which do not give rise to an action for intentional infliction of emotional distress. *Amstadter,* 223 Ga. App. at 243, 503 S.E.2d at 881.

Additionally, Plaintiff has failed to show that she suffered from severe emotional distress as a result of Ms. Patman's conduct. "The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it . . . ." *Bridges v.*

22

*Winn-Dixie Atlanta, Inc.*, 176 Ga. App. 227, 230, 335 S.E.2d 445, 448 (1985) (quoting Restatement (Second) of Torts § 46(1) cmt. j (1965)). Plaintiff claims that as a result of her termination she had low self-esteem and headaches, felt upset and stress from having to find another job, and would cry sometimes.  This emotional distress is not so severe that a reasonable person could not be expected to endure it. Summary judgment is therefore appropriate.

### CONCLUSION

Defendant's Motion for Summary Judgment is denied as to Plaintiff's federal discriminatory termination claim.  Defendant's motion is granted as to each of Plaintiff's other claims.[9]

IT IS SO ORDERED, this 29th day of November, 2005.

S/Clay D. Land
                  CLAY D. LAND
                  UNITED STATES DISTRICT JUDGE

---

[9]Based on today's Order, the only claim that remains to be tried is Plaintiff's federal claim that Defendant terminated her employment because she was pregnant.

23